**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**PATRICIA WHEELER**,

    Plaintiff,

        v.

**GEORGETOWN UNIVERSITY HOSPITAL**,

    Defendant.

Civil Action No. 10-1441 (JEB)

## MEMORANDUM OPINION

On December 28, 2009, a troop of nurses paraded through Clinical Manager Angela Hollandsworth's office at Georgetown University Hospital. Each nurse echoed a similar complaint. The first reported that another nurse, Plaintiff Patricia Wheeler, had delivered unnecessary medication to a patient, while neglecting to give that same patient prescribed doses of insulin. The next nurse noted that Wheeler had not properly recorded patient vitals during the previous day's shift. The third advised that Wheeler had left yet another patient, who could not voluntarily move, soaked in her own saliva and lying in her own excrement. The fourth nurse contended that Wheeler had left still another patient sitting in a blood-stained gown, that she had let the patient's antibiotic bag run out, and that this other patient had also sat caked in dried stool for an indeterminate period of time. After considering these allegations and speaking with Nurse Wheeler, Hollandsworth decided that she had to be terminated. Hardly a shocking personnel move.

Wheeler, who is black, brought this suit claiming that Hollandsworth's decision was based on racial animus. Instead, the evidence shows that her verdict was premised on an honest and reasonable belief in the veracity of the other nurses' reports. As a result, the Court will grant Defendant Georgetown University Hospital's Motion for Summary Judgment and dismiss the case.

I.  **Factual and Procedural Background**

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that from March 2006 until January 2010, Georgetown University Hospital employed Wheeler as a registered nurse in a department known as "4 East." Mot., Exh. 1 (Affidavit of Angela K. Hollandsworth), ¶ 2. As a nurse, Wheeler's responsibilities included "providing direct patient care," which involved tasks such as delivering medication and assessing patient needs, as well as "communicating information" about the patient and her care to "the appropriate medical team, patient[,] and family." Id., ¶ 7. The hospital, of course, has myriad rules and policies prescribing both how nurses are to treat patients and how they must share treatment information with doctors and families alike. See id.; see also Mot., Attach. E (GUH Policy 110: Reconciliation, Administering and Charting of Medication); Attach. F (GUH Policy 124: Intravenous Therapy in the Adult); Attach. G (GUH Policy 404: Medical Record Documentation); Attach. H (GUH Policy 414: System Down Time).

Beginning in March 2007, Wheeler was supervised by Hollandsworth. See Hollandsworth Aff., ¶¶ 3-4. According to Plaintiff, she and Hollandsworth were often at odds. Wheeler observed that "once Angela became [her] manager[,] she would pull [her] in the office frequently about any and every little thing, about performance." Opp., Exh. 1 (Deposition of Patricia Wheeler) at 84:8-11. On at least two occasions prior to December 27, 2009,

2

Hollandsworth gave Wheeler formal warnings regarding her work performance. In December 2008, for example, Hollandsworth admonished Plaintiff after she had allegedly withheld a dose of medication without noting it on a patient's chart, failed to change a patient's IV dressing, and failed to print out and interpret certain patient vitals during her shift. See Mot., Attach. Q (Verbal Warning Letter, December 23, 2008) at 1. In April 2009, Wheeler also received a warning for missing work on three occasions. See Mot., Attach. R (Verbal Warning Letter, April 23, 2009) at 1. Similar absences were noted in her yearly reviews. See Opp., Exh. 11 (2008-09 Performance Evaluation) at 2; Exh. 12 (2007-08 Performance Evaluation) at 2. Hollandsworth and her predecessor also wrote informal notes about other sundry performance shortcomings, see Mot., Attach. K-P (Notes on Performance Shortcomings), although Plaintiff claims that no other incidents were ever discussed with her and that, as a result, they probably never happened. See, e.g., Wheeler Depo. at 110:1-22, 118:7-22. Given Plaintiff's sworn testimony, the Court will assume that the only relevant, pre-existing disciplinary incidents are the two formal warnings found in her personnel file that Wheeler herself countersigned.

Despite these low-level reprimands, Wheeler's woes truly snowballed beginning on the morning of December 27, 2009. Ordinarily, she worked with patients who were not in critical condition. That day, though, Wheeler was floated to the Intensive Care Unit, which was in need of additional nurses. See Mot., Attach. I (Wheeler E-mail of Jan. 1, 2010) at 1. In the ICU, Wheeler was in charge of three patients, whose vitals were to be taken every four hours. See id. at 1. Her shift ran from 7 a.m. to 7 p.m. Id. Over the course of a single day, no fewer than four other nurses expressed concern regarding Wheeler's treatment of those same three patients.

The first complaint that Hollandsworth received came from Nurse Amy Kelliher. See Hollandsworth Aff., ¶ 8; Mot., Attach. A (Statement of Amy Kelliher) at 1. Kelliher wandered

3

into the room of one of Wheeler's patients when she heard the patient's IV beeping, meaning that it needed to be refilled. See Hollandsworth Aff., ¶ 8. The empty bags attached to the patient's IV had contained Nexium and magnesium. Id. When Kelliher asked Wheeler about the patient, Plaintiff stated that the IV should have been delivering normal saline, not medication. Id. In addition to discovering the wrong IV hooked up, Kelliher also found that Wheeler had neglected to give the patient two doses of sliding-scale insulin. Id. And, as hospital policies explain, errors in delivering insulin can have particularly severe consequences. See GUH Policy 110 at 8 (listing insulin as a "High Alert" and/or "Hazardous Medication").

That same day, Nurse Ruth Burke also raised concerns about Wheeler's treatment of patients. See Hollandsworth Aff., ¶ 9; Mot., Attach. B (Statement of Ruth M. Burke) at 1. Burke claimed that Wheeler had neglected to record vital signs for at least two of her three patients, failed to monitor a patient's temperature, and improperly set a blood-pressure cuff on a patient. See Hollandsworth Aff., ¶ 9. Nurse Kelliher confirmed that Wheeler had not logged vital signs for her patients. Id. This, too, violated hospital policy. See, e.g., GUH Policy 404; GUH Policy 414.

In addition, yet another nurse, Linda Ames-Sommersville, consulted Hollandsworth about one of Wheeler's patients. See Hollandsworth Aff., ¶ 10; Mot., Attach. C (Statement of Linda Ames-Sommerville) at 1. That patient could not make any voluntary movement. See Ames-Sommerville Statement at 1. When the family arrived in the morning around 10 a.m., Ames-Sommerville reported, their daughter was slouched against the rails of her bed in an uncomfortable position. Id. Her gown and sheets were soaked through with saliva, so the family had to call for help to get her cleaned up. Id. Although the family stayed with her for five hours, Nurse Wheeler reportedly never came back to check on the patient. Id. When the family left and

4

returned after dinner, the patient was again slumped against the rail and was caked in dry stool. Id.

Finally, Nurse Brittany Buchanan also alerted Hollandsworth to problems with Wheeler's third patient. See Hollandsworth Aff., ¶ 11; Mot., Attach. D (Statement of Brittany M. Buchanan) at 1. Around 2 p.m., Buchanan noticed that the patient had experienced a bowel movement and that there was blood on the patient's gown. See Statement of Brittany M. Buchanan at 1. She offered to help Wheeler clean up the mess, but, evidently, Wheeler declined. Id. A technician summoned Buchanan to the room again around 6 p.m. because the patient's gown still had blood on it. Id. The nurse discovered that the patient remained covered in dried stool, so she assisted – finally – in getting the patient cleaned up. Id. Buchanan also noticed that an empty antibiotic bag was piggybacked onto the patient's heparin IV drip and had not been refilled or removed. Id.

Worried about the impact that this level of care could have on patients, Hollandsworth suspended Wheeler while she investigated the day's incidents. See Hollandsworth Aff., ¶ 13. Hollandsworth interviewed each of the nurses who had reported concerns with Wheeler's patients and put those complaints in writing. See id., ¶ 14. She met with Wheeler herself to discuss the incidents and asked her to provide a written explanation of the day's events, which Plaintiff did. See id., ¶ 15. After taking all the information into account, Hollandsworth and Michelle Lawyer in the hospital's Human Resources Department determined that Wheeler's missteps warranted termination. See id., ¶ 16. Although, according to Defendant, Wheeler's conduct on December 27th alone constituted a fireable offense, her history of performance issues also affected Hollandsworth's decision. See id., ¶ 17.

On January 8, 2010, Hollandsworth and her supervisor, Sue Howell, met with Wheeler to inform her of the decision to terminate her based on the events of December 27th. See id., ¶ 20. Wheeler, understandably, was upset by her suspension and ultimate termination. According to her, the other nurses' negative reports were based on a series of misunderstandings. For example, she claims that the patient who missed his insulin doses did not need the insulin because his blood sugar was just fine. See Jan. 1 E-mail at 2. She also contends that she took him off of the Nexium as ordered, but forgot to throw away the empty IV bag – although it is unclear what the magnesium was doing on his IV. See Mot., Attach. J (Wheeler E-mail of Jan. 6, 2010) at 1. In addition, she seems to blame the documentation mishaps on computer errors of some sort that were, apparently, common in the hospital. See Jan. 1 E-mail at 2-3. In terms of the patient who could not move, Wheeler claims that she suctioned her saliva around 8 a.m. and that a technician from the respiratory department did the same thing around 9:20 a.m. See id. at 1. It is thus unclear how the patient ended up being soaked in her own excretions. She also remembers bathing and turning the patient every two hours, so she thinks the bowel movement must have happened after her shift ended. Id. at 2. In terms of Wheeler's third and final patient, she asserts that no one told her that the patient was covered in blood and stool as of 2 p.m. Id. She also notes that she was prepared to clean up the patient at 6 p.m., but that she left the room for 15 minutes while another employee prepped him, and Nurse Buchanan ended up swooping in during that interval and doing the job for her. Id.

Plaintiff contends that she was fired not based on the reports of the other nurses; rather, she claims that she was the victim of racial discrimination. Notably, Wheeler does not argue that the other four nurses harbored discriminatory animus, nor does she contest the fact that those nurses actually aired their concerns to Hollandsworth. Instead, she avers that white nurses have

6

engaged in comparably bad behavior and have not been fired or even reprimanded. A nurse called C.S., for example, discontinued a medication without noting it on the patient's chart, and she was not written up or fired.[1] See Wheeler Depo. at 52:7-55:21. Nurse K.M. neglected to report a change in her patient's mental status, and the patient ended up foaming at the mouth and being transferred to the ICU. See id. at 65:3-68:22. In addition, Nurse W.L. once calculated an incorrect dosage of heparin, which is a medication that keeps blood from clotting. The patient then crashed and had to be transported to the ICU. See id. at 216:7-221:15. Nurse A.A. also allegedly erred by failing to equip a patient with a bite block, which resulted in the patient's biting through her tongue and bleeding profusely. See id. at 249:17-250:22. Wheeler claims that all of these nurses were white, none was suspended, and none was fired.

Finally, another two nurses' actions actually resulted in a patient's death, and they were not fired either. See id. at 221:17-226:3. More specifically, Nurses B.D. and C.R. also calculated an incorrect dosage of heparin, which caused their patient to experience complications, crash, and later die. See Opp., Exh. 5 (Pl. Answer to Interrogatories) at 3. The two nurses were suspended, but eventually returned to work. Id. Hollandsworth, as far as the evidence indicates, was not their supervisor. Id.

Feeling she had been mistreated, Wheeler filed a complaint with the EEOC on January 7, 2010 – before she was fired – and filed formal charges with the EEOC and D.C. Office of Human Rights on January 21st. See Mot., Exh. 4 (EEOC Intake Questionnaire) at 1-4; Mot., Exh. 6 (Charge of Discrimination) at 1. This litigation followed. Wheeler originally complained of racial discrimination, retaliation, termination in violation of public policy, and breach of

---

[1] Given that these nurses did not have an opportunity to defend their conduct on the record, and given that

7

contract. The latter two counts were dismissed by this Court in 2011, see Wheeler v. Georgetown University Hosp. (Wheeler I), 788 F. Supp. 2d 1 (D.D.C. 2011), and Plaintiff now concedes that the retaliation charge should be dropped. See Opp. at 6. As a result, the sole issue for determination at summary judgment is Wheeler's allegation that she was fired on account of racial discrimination in violation of Title VII.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty

---

the Court does not independently assess the truth of parties' assertions on summary judgment, it uses the nurses' initials to protect their privacy.

Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

In light of this requirement, and pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-judgment motions, "assume[s] that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

Georgetown argues that Wheeler has failed to comply with this requirement, as her Statement of Material Facts in Dispute and Response to Defendant's Statement of Undisputed Facts are inadequate. For the most part, however, Wheeler does a fine job citing to the record and pointing to specific facts that she believes are in controversy. She does occasionally treat legal conclusion as facts, such as the "fact" that "Ms. Wheeler was terminated and suspended because of her race." See Pl. Statement of Material Facts, ¶ 31. But of course, the Court need not treat those legal conclusions as true. To the extent that Plaintiff's documents contain vague or broad statements unsupported by record evidence, the Court need not accept those assertions as true either. See Valles-Hall v. Ctr. for Nonprofit Advancement, 481 F. Supp. 2d 118, 123-24

9

(D.D.C. 2007); see also Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324. Plaintiff's response to Georgetown's factual proffer is ultimately not so convoluted that the Court need treat the hospital's version of the facts as conceded. The Court, accordingly, will accept Wheeler's facts as true only to the extent that they are supported by citations to the record; Georgetown's version will stand where Plaintiff offers no specific opposition.

### III. Analysis

Title VII makes it "an unlawful employment practice . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Because Wheeler was concededly "discharge[d]," the sole inquiry here is whether she was terminated "because of" her race. Id.

Title VII claims of race discrimination ordinarily proceed in three steps. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Kersey v. Washington Metr. Transit Auth., 586 F.3d 13, 16-17 (D.C. Cir. 2009). First, the plaintiff carries the initial burden of establishing a *prima facie* case of racial discrimination. See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); Kersey, 586 F.3d at 17. To pass that hurdle, a plaintiff need only show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005)). Next, the defendant typically rebuts that *prima facie* showing with evidence of "a legitimate, nondiscriminatory reason" for its actions. Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 142 (2000). Finally, if the defendant has produced such evidence, then the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 143 (internal quotation marks

omitted). In other words, the plaintiff must prove "that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

At the summary-judgment stage, however, the inquiry typically collapses into one simple question: Given all the evidence, could a reasonable jury conclude that "the defendant intentionally discriminated against the plaintiff"? Id. at 494 (internal quotation marks omitted). Once an employer has offered legitimate, non-discriminatory reasons for firing the plaintiff, "the *prima facie* case" becomes "a largely unnecessary sideshow." Id. (italics added). After all, a jury would be permitted to consider all the evidence on both sides of the scale – not only the defendant's explanation of the firing and whatever evidence formed the plaintiff's *prima facie* case, but also any other facts tending to demonstrate racial animus. The relevant inquiry at the summary-judgment stage, as always, is simply whether the facts, viewed in the light most favorable to the plaintiff, would permit a reasonable jury to find in her favor.

For Wheeler's discrimination claim, therefore, the relevant question is whether Plaintiff has produced enough evidence to convince a jury that Georgetown's stated reason for firing her – namely, allegations of patient mistreatment by no fewer than four nurses – is a mere pretext for what was actually race discrimination. See Brady, 520 F.3d at 494.

Plaintiffs typically take one of two approaches in attempting to undermine an employer's stated reason for their termination. In some cases, "the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." Id. at 495. Wheeler does this by claiming that her errors on December 27th either never happened or were easily explainable. Other times, "the employee

11

attempts to" prove discrimination by showing "that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances." Id. Wheeler also takes this alternative approach by claiming that white nurses engaged in similar misconduct and were not terminated. The Court will address each of these two theories in turn.

### A. Fabricated Reasons for Termination

Wheeler first contends, to paraphrase Mark Twain, that the reports of her misconduct were greatly exaggerated. In other words, because she did not actually engage in misconduct on December 27th, her termination must have been a pretext for discrimination. See, e.g., Royall v. National Ass'n of Letter Carriers, 548 F.3d 137, 145 (D.C. Cir. 2008) (may infer pretext where "proffered reasons for terminating [plaintiff's] employment are unpersuasive").

An important caveat is in order here. "[P]roving that an employer's reason" for terminating an employee "is false will not always be sufficient to demonstrate pretext. This is so because an employer's action may be justified by a reasonable belief in the validity of the reason given[,] even though that reason may turn out to be false." George, 407 F.3d at 415 (emphasis added). Put another way, when an employer bases her termination decision on complaints from other employees, "[t]he question is not whether the underlying [misconduct] occurred." Brady, 520 F.3d at 496. Instead, "the issue is whether the employer honestly and reasonably believed that the underlying . . . incident occurred." Id.

For purposes of this Motion, the Court must, of course, treat all of Wheeler's record evidence as true, which includes her own sworn testimony. The Court thus must accept that the complaints of patient mistreatment were either based on mistakes or failed to put Plaintiff's actions in context. Wheeler appears to concede, however, that the other nurses at least made

12

these reports to Hollandsworth, and that the allegations levied by each nurse were memorialized in Hollandsworth's follow-up e-mails to them.

Whether and how these incidents occurred, then, is largely beside the point. Rather, this case turns on whether Wheeler has produced enough evidence to undermine the conclusion that Hollandsworth <u>honestly and reasonably believed</u> that Plaintiff had mistreated patients.

To review the bidding: On December 28, 2009, the day after Wheeler's alleged mishaps, Hollandsworth first received a report from Nurse Kelliher. She was concerned because Nurse Wheeler appeared to have administered the wrong medication to a patient and had also failed to give that patient his insulin doses. <u>See</u> Hollandsworth Aff., ¶ 8. She also confirmed a report from Nurse Burke – a second, independent nurse – that Wheeler had not been logging patient vitals as required. <u>See</u> <u>id.</u>, ¶ 9. Then a third nurse, Ames-Sommerville, raised concerns about another of Wheeler's patients, who had ended up soaked in her own saliva and caked in excrement. <u>See</u> <u>id.</u>, ¶ 10. Finally, yet another nurse, Buchanan, reported that Wheeler had left a patient in a bloody gown, failed to properly administer that patient's antibiotic drip, and also left that patient covered in dried stool. <u>See</u> <u>id.</u>, ¶ 11.

Now, of course, Wheeler proffered her own explanation for each of these incidents. <u>See</u> Jan. 1 E-mail at 1-3. But the question here is not whether her explanation was ultimately the correct one. The Court assumes that it is. The question is simply whether a reasonable jury could infer that Hollandsworth was discriminating against Wheeler when she credited the other nurses' accounts and ultimately terminated Wheeler. Again, these reports were conveyed by not one, not two, but <u>four</u> separate nurses. Given the gruesome details of those reports, no reasonable jury would likely so much as raise an eyebrow at the fact that Wheeler was fired.

13

Perhaps Wheeler means to argue that Hollandsworth credited the other nurses' accounts over hers due to discrimination, or that the investigation was somehow less thorough because Hollandsworth was inclined to doubt Wheeler's competence anyway. In terms of Hollandsworth's decision to credit the other nurses over Wheeler, the Court finds no evidence of animus in that determination. Every day, employers "must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information." Brady, 520 F.3d at 496. Unless there is some reason to believe that Hollandsworth's resolution of this factual dispute was not made honestly and in good faith, her decision cannot be questioned. Id. Here, the Court finds nothing to undermine Hollandsworth's faith in the nurses' reports. Even Wheeler does not appear to question that those reports themselves were made in good faith; nor does she appear to contend that the nurses (as opposed to Hollandsworth) were acting with animus. It is thus implausible to claim that Hollandsworth's action in crediting those accounts was motivated by race.

In terms of the investigation, moreover, nothing in the record indicates that Hollandsworth's inquiry was anything other than thorough – or that she deviated in any way from the standard procedure. On December 29, 2009, she issued a suspension letter to Wheeler so that she could investigate "allegations of patient neglect, failure to administer medications in accordance with hospital policy, failure to provide basic care needs to [her] patients, and failure to document in accordance with hospital standards." Mot., Exh. 2 (Suspension Letter); Hollandsworth Aff., ¶ 13. Hollandsworth then interviewed Nurses Kelliher, Ames-Sommerville, Burke, and Buchanan, and confirmed their accounts in writing. See Hollandsworth Aff., ¶ 14. She next met with Plaintiff on December 30, 2009, discussed the incidents, and asked for – and subsequently received – written explanations from Plaintiff. Id., ¶ 15. After examining all of

that information, Hollandsworth discussed her tentative decision to terminate Wheeler with HR and was given the green light. Id., ¶ 16. Plaintiff does not allege that anything about this by-the-book process was unusual or was manipulated to discriminate against her – although she does wish that Hollandsworth had talked to some additional co-workers. But in this case, as always, the Court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Here, the Court can find no evidence that would lead a reasonable jury to question the good faith of Hollandsworth's determination or efforts.

B. Comparator Evidence

Facing a stiff headwind on the argument that her reported dereliction of duty should not have led to termination, Wheeler trims her sails and tries another tack. Still seeking to prove that Hollandsworth's decision was in fact a pretext for discrimination, Plaintiff contends that other, white nurses engaged in similar misconduct, yet they were not fired for their behavior. See 1 Lex K. Larson, Employment Discrimination § 8.04, at 8-66 (2d ed. 2007) ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment."), quoted in Brady, 520 F.3d at 495.

As evidence, Plaintiff recites the alleged actions of five other nurses. Nurse C.S., like Nurse Wheeler, discontinued medication without noting it on the patient's chart – yet she was not written up or fired. See Wheeler Depo. at 52:7-55:21. Nurse K.M. once failed to report a change in her patient's mental status, and the patient ended up foaming at the mouth and being transferred to the ICU – while none of Nurse Wheeler's patients suffered any such harm. See id. at 65:3-68:22. Nurse W.L. similarly caused a patient harm by calculating an incorrect dosage of

15

heparin. See id. at 216:7-221:15. In addition, Nurse A.A. neglected to equip a patient with a bite block, which resulted in profuse bleeding. See id. at 249:17-250:22. Wheeler claims that all of these nurses were white and none was fired for her misconduct.

Comparing Wheeler's missteps with the actions of these other nurses, however, is like comparing an acorn to an oak tree. Each of the white nurses committed one error that affected one patient; Wheeler committed at least four, concerning three separate patients, all on the same day. The other nurses, as a result, are not useful comparators. See Royall, 548 F.3d at 145 (plaintiff must show "that all of the relevant aspects of [her] employment were nearly identical to those of" comparator) (internal quotation marks omitted); Wilson v. Lahood, 815 F. Supp. 2d 333, 338 (D.D.C. 2011) ("The identified employee must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.") (internal quotation marks omitted). The fact that one nurse would be fired for four incidents involving three patients in one day, while another nurse would escape punishment for one incident affecting one patient on one day is not "the least bit fishy." Fischbach, 86 F.3d at 1184. To be sure, the other nurses' patients suffered harm in some cases, but Wheeler's patients may also have been in danger of harm based on a missed dose of insulin or antibiotics. It would be impossible for a jury to find that one scenario could be measured against the other.

In addition, Wheeler argues that two other nurses' actions resulted in a patient's death and that they were not fired, although they were at least suspended. See Wheeler Depo. at 221:17-226:3. This, she claims, is surely worse than her actions on December 27th. The death of a patient must be an incident of grave concern to any hospital. But again, it is not the Court's

place to step in and decree that four fairly bad incidents on one day do not deserve more serious punishment than one terrible incident. In addition, it does not appear from Plaintiff's evidence that Hollandsworth even supervised the nurses whose patient died. Id. If she had, perhaps they, too, would have been fired. There is simply no way to know. See Lahood, 815 F. Supp. 2d at 338 ("The identified employee must have dealt with the same supervisor" to be adequate comparator.) In any event, the fact that some other supervisor failed to fire two nurses who miscalculated a dose of heparin with very bad results does not raise an inference that Hollandsworth discriminated when she fired Wheeler for making several missteps with non-fatal results.

In addition, Wheeler does not present much evidence regarding the performance history of the white nurses to whom she would compare herself. That also makes meaningful comparison difficult. See Royall, 548 F.3d at 145; but see Hollandsworth Depo. at 73:3-80:13. As Hollandsworth admits, although Wheeler was fired for her conduct on one December day, her poor performance history also played a role in the ultimate decision to terminate her. See Hollandsworth Aff., ¶ 17. Wheeler claims that she generally performed up to expectations, so we must accept that contention as true. She also, however, had two verbal warnings on file; her annual reviews noted some problems with attendance; and Hollandsworth claims that Plaintiff's prior supervisor passed on some performance concerns as well. Id. So there were some performance issues on record, even if those incidents, too, were understandable or easy to explain away. And there is nothing untoward about a supervisor taking an employee's record into account when deciding what disciplinary measure to take. This also might have influenced Hollandsworth's decision to fire Wheeler when other nurses' errors did not result in termination.

17

Finally, Wheeler contends that, prior to the incidents that led to her firing, Hollandsworth "would pull [her] in the office frequently about any and every little thing, about performance" and was generally tough on her, likely because of her race. Wheeler Depo. at 84:8-11. Wheeler claims that this harsh treatment, which white nurses were not subjected to, sheds light on Hollandsworth's true motives. But Wheeler's evidence shows, at best, that there were some occasions when white nurses were not formally disciplined for small infractions on par with Wheeler's prior performance issues – *i.e*., issues that lead to counseling or a verbal warning. See, e.g, Wheeler Depo. at 94:3-108:15. In her deposition, however, Hollandsworth recalled other times that those same nurses or other white nurses were spoken to or given verbal warnings, just like Wheeler. See Hollandsworth Depo. at 73:11-80:13. All this shows, then, is some inconsistency in Hollandsworth's day-to-day disciplinary process – not intentional discrimination sufficient to call Wheeler's firing into question.

At the end of the day, were the Court to buy Wheeler's comparator theory, employers in sensitive fields like medicine – where even small mistakes by nurses may have an adverse effect on patients – would have to fire either everyone or no one. This comports with neither common sense nor what the law requires. Context, after all, matters. And antidiscrimination law allows employers to take context into account. So if an employee with a spotless record makes one awful mistake, and an employee with a spotty record makes four very bad ones, the employer – who is, of course, in the best position to judge her employees' performance – can make the final call. She is not required, in the name of equity, to fire either both or no one at all.

IV.    **Conclusion**

Overall, then, there is simply no reason to question Hollandsworth's good faith in determining that Wheeler deserved to be terminated based on the reports she received on

December 28, 2009. For the foregoing reasons, the Court concludes that Georgetown is entitled to summary judgment. The Court will therefore grant Defendant's Motion. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: June 27, 2014